# UNITED STATE DISTRICT COURT

# DISTRICT OF CONNECTICUT

3:15-CV-247 MPS

ZOHAIR ALNABULSI                                02/20/2015

Plaintiff,

V.

MIDLAND FUNDING, LLC.

Defendant.



## COMPLAINT

This action is brought pursuant to the Connecticut Unfair Trade Practices Act, Connecticut. Gen. Stat. §§ 42-110a through 42-110q, and Fair Debt Collection Practices Act (FDCPA), Pub. L. 95-109; 91 Stat. 874, codified as 15 U.S.C. § 1692-1692P, APPROVED ON September 20, 1977 (and as subsequently amended) is a consumer protection amendment, establishing legal protection from abusive debt collection practices, to the Consumer Credit Protection Act, as Title VIII of that Act, and the Connecticut General Statutes Section 36a-647 and 36a-800 to 36a-810. This is an action arising from violation of Connecticut Unfair Trade Practices Act, and the FDCPA, and also seeks to secure recovery of damages, appropriate declaratory, injunctive, punitive damages, cost and attorney's fees and other equitable relief against the Defendant for engaging in false, misleading, unfair or deceptive acts or practices.

## THE PARTIES

1-   Plaintiff Zohair Alnabulsi a Guilford Connecticut resident.

2- Midland Funding, LLC (hereinafter "Midland"), a Delaware limited liability corporation with its principal place of business located at 8875 Aero Drive, Suite 200, San Diego, California, 92123, and Midland Credit Management, Inc. (MCM) is a Kansas corporation with its principal place of business located 8875 Aero Drive, Suite 200, San Diego, CA 92123, and conduct business in the State of Connecticut.

3- Both Midland Funding and Midland Credit Management (MCM), are a subsidiaries of Encore Group, Inc., a Delaware corporation.

## JURISDICTION AND VENUE

4- This Court has jurisdiction to hear this case and provide requested relief pursuant to CUTPA, Articles Conn. Gen. Stat. § 42-110g(a), Conn. Gen. Stat.§ 42, Conn. Gen. Stat. § 110g(d)and FDCPA, § 1692i.

## FACTS

5- Midland conducts business as "debt buyer"-"debt collector" which is an entity that purchases portfolio of debt, primarily charged-off consumer debt, from the original debt buyer.

6- Over the past 20 years Midland and its parent company Encore Capital Group Inc, have purchased 33 million consumer accounts with face value of $54.7 billion dollars for $ 1.8 billion dollars. This is an average of 3.3 cents per dollar of debt acquired.

7- Many people fail to pay their credit card debts, because they get sick or lose their jobs or both.

8- Credit card companies keep charging high interest and late fees "default fees" for a long time after the consumer stop paying or paying less than the minimum payment required.

9-   In most cases after a period of time after the consumer have defaulted, Credit Card companies sell the consumer debts to a "debt collector" for pennies on the dollar.

10-   In many cases the high interest and the late charges added to the credit card holder balance, causes the amount to exceed more than twice as much as the original amount charged (spent) by the consumer.

11-   Credit card companies take federal and state tax write off on the loss. After accounting for the accumulation of the extra charges (late fees and high interest). In many cases the credit card companies do not lose the original amount charged (spent) by the consumer due to the tax benefit of writing off the debt.

12-   The majority of credit cards are issued by big banks. When those banks screwed up, the government bailed them out.

13-   Midland generate a significant portion of their revenue by filing lawsuits and collecting on judgments against individual consumers.

14-   In addition to the increased amount of debt that the consumer is burdened with, Midland after being granted the judgment without trial, adds more charges to the already behind consumer.

15-   Most consumers who fall behind, and could not pay credit card companies, end up having bad credit history, and suffer tremendously. In many cases bad credit reduce their capability of finding a job, getting a car loan, finding a place to live, and increases insurance rates.  Those consumers did not get any bail out, instead their financial situation worsen, especially when they have to deal with a predatory debt collector like Midland.

16-  Midland, and other debt collectors, will do whatever it takes to collect the debt Wither it is legally, (or illegally if they can get away with it), and adds more fees and interest to the original amounts. They can garnish wages, put a lien on a house, and take money from bank accounts.

17-  Most consumers who end up dealing with Midland are intimidated by the legal process, in many cases they do not know their rights. They do not know how

to defend themselves, even if Midland's practices of collecting the debts are shoddy or illegal. They end up suffering financially for a long time.

18- Midland broke the law in many cases by harassing and abusing many consumers.

19- According to the FTC:

'"Debt collectors generate more complaints to the FTC than any other industry. Although many debt collectors are careful to comply with consumer protection laws, others engage in illegal conduct. Some collectors harass and threaten consumers, demand larger payments than the law allows, refuse to verify disputed debts, and disclose debts to consumers' employers, co-workers, family members, and friends. Debt collection abuses cause harms that financially vulnerable consumers can ill afford. Many consumers pay collectors money they do not owe and fall deeper into debt, while others suffer invasions of their privacy, job loss, and domestic instability.

The FTC enforces the Fair Debt Collection Practices Act ("FDCPA"), which prohibits deceptive, unfair, and abusive debt collection practices. Among other things, the FDCPA bars collectors from using obscene or profane language, threatening violence, calling consumers repeatedly or at unreasonable hours, misrepresenting a consumer's legal rights, disclosing a consumer's personal affairs to third parties, and obtaining information about a consumer through false pretenses. Because certain practices that violate the FDCPA also violate the FTC Act, the FTC also uses the FTC Act to halt unfair or deceptive debt collection practices.

The FTC has sued over 30 debt collection companies for violating the law, banning some from the business and making them pay steep financial penalties. The FTC also has recommended that Congress and the states modernize the debt collection laws to reflect changes in consumer debt, the collection industry, and technological developments that affect consumers and collectors alike. For example, a 2010 FTC report concluded that the process that many debt collectors use to sue alleged debtors or force them to arbitration is seriously flawed and causes substantial consumer harm. The report recommended that government, industry, and others adopt significant reforms."

20- Midland filed 245,000 collection lawsuits nationwide in 2009. The majority of these lawsuits resulted in default judgment in favor of Midland, because the unrepresented defendants failed to appear or respond.

21- At least (3) MCM employees admitted under oath in different sworn deposition testimony that they signed false statements that were filed in courts around the country to obtain judgments against individual citizens in favor of Midland. See State of Minnesota ex rel. Swanson V. Midland Funding LLC, et al., 2011 WL 1909418 (Minn.Dist. Ct.).

22- These (3) MCM employees testified that MCM's practice to have them each sign 300- 400 computer generated affidavits each day without reading the affidavits, having any knowledge of the information in the affidavits or checking the accuracy of the information to which they were attesting, including the validity of the alleged debt.

23- These MCM employees testified that, although these affidavits referenced attached exhibits and attested to the accuracy of such documents, the affidavits were routinely signed without reviewing the exhibits, if the exhibits were, in fact, attached to the affidavits.

24- In some instances, the MCM employees merely signed the affidavits, had their signatures notarized and then mailed the affidavits to the collection law firms with no knowledge as to who would later attach the exhibits to which they had attested.

25- These affidavits were mass produced, computer-generated documents that do not meaningfully substantiate to authenticity of the alleged debt.

26- These MCM employees also testified that Midland used robo-signed affidavits attesting to the authenticity of documents attached to the affidavit that purported to substantiate the debt.

27- Attorney General Lori Swanson of Minnesota obtained consent judgment in "robo-signing" against Midland in 12/12/2012. See. 27-CV-11-11510. Hon. Denise

D. Reilly. Midland used these robo-signed affidavits when filing both motions for default judgment and motions for summary judgment.

28-    The practices described above enabled Midland to obtain judgment against the plaintiff based upon incomplete information supported by what could be a false or fraudulent affidavits.

29-    In 2008 Plaintiff went through a failed back surgery and was diagnosed with Complex Regional Pain Syndrome (CRPS). He lost his job and became disabled.

30-    Midland sued plaintiff in 11/23/21011, for a credit card debt purchased from Chase Bank.

31-    In 03/27/2012 Midland was granted a judgment without a trial-general against the plaintiff for the sum of $5,836.63.

32-    In 04/03/2012, Midland obtained a Lien judgment against plaintiff, however, this was place on 2 Covey Crossing Guilford, CT 06437. The plaintiff did not have ownership or claim to 2 Covey Crossing in Guilford CT at the time of the Lien judgment.

33-    It is not clear yet if Midland performed a title search on this property (2 Covey Crossing),

34-    The owner of 2 Covey Crossing was not aware of the presence of the Lien until March of 2013, when the owner was notified at the time of closing of a mortgage refinance.

35-    The owner of 2 Covey Crossing could not close on the refinancing agreement until the   judgment amount is satisfied, as a result the refinancing process was halted.

36-    The owner called Midland to explain the situation. Midland employee did not resolve the issue.

37-    The delay in closing ended up costing an extra 25 basis point, 0.25% on the entire amount of the loan, additional attorney fees to deal with the lien problem, and contacting Midland attorney to resolve the issue.

38-     Plaintiff was notified of the presence of the Lien for the first time, and was blamed for the delay in closing, the higher rate on the mortgage, and extra cost imposed on the owner as a result of the Lien. This caused the plaintiff to become depressed, increased the episodes of migraine headaches, and sleep disturbances.

39-  The Plaintiff borrowed $7,500 from a friend and gave it to the owner of 2 Covey crossing to put in escrow. Plaintiff drove from Guilford Connecticut to Bloomingdale, NJ to get the money. Plaintiff was charged $500 upfront fee, from the lender so he can get the money, and additional 2% a month in interest. This caused the plaintiff more stress since he already owes money to friends and family members.

40-     Midland has little incentive to spend the time and resources necessary to respond to consumers' disputes for information about alleged debts.

41-     Midland profits are derived in part from collecting money from alleged debtors, whether the individuals they are targeting actually owe the money or not.

42-     Midland performed a lien on a property belongs to someone never have any relationship with them, and never heard of them. This is an unfair, deceptive conduct to collect a debt.

This is an immoral, unethical, oppressive, and unscrupulous act in behalf of Midland.

This caused the Plaintiff to come up with money he does not have, to make sure the refinancing process will continue.

43-     Midland unreasonable debt collection practice and its invasion of privacy caused harm to the plaintiff and the owner of 2 Covey crossing.  It causes fights and hardship in addition to monetary losses.  It caused embarrassment, humiliation in front of the attorney, and the bank officers involved in the closing process.

## COUNT 1

### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

44-   Connecticut Unfair Trade Practices Act was enacted to prohibit unfair or unconscionable acts. Conn. Gen. Stat. § 42-110b(a), prohibits deceptive acts Conn. Gen. Stat. § 42-110b(a), and provides the state agency substantive rulemaking authority. Conn. Gen. Stat. § 42- 110b. The Act allows for compensatory damages, Conn. Gen. Stat. § 42-110g(a), multiple or punitive damages. Conn. Gen. Stat. § 42-110g(a), and Attorney fees, Conn. Gen. Stat. § 110g(d)

## COUNT 2

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

45-   The FDCPA was enacted to "eliminate" a number of activities and conduct on the part of debt collectors such as "abusive debt collection practices by debt collectors...and... to protect consumers against debt collection abuses." 15 U.S.C § 1692(e). To that end, the FDCPA prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection of a debt." 15U.S.C. § 1692d. The Act, inter alia, also states that the debt collector "may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e, and "may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

46-   The plaintiff has been the object of collection activity arising from consumer debt.

47-   The Defendant Midland knowingly and deliberately routinely engaged in numerous acts or omissions prohibited by the FDCPA, including but not limited to the following.

(a) engaging in conduct the natural consequence of which was to harass, oppress, or    abuse the Plaintiff in connection with the collection  of a debt, in violation of 15 U.S.C. § 1692d.

(b) using false, deceptive or misleading representation or means in connection with the collection of a debt in violation of Section 1692e.

(c) using false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer in violation of Section 1962e(10);

(d) (1) using unfair or unconscionable means to collect or attempt to collect any debt in violation of Section 1692f; (2) taking or threatening to take non-judicial action to repossess property where there is no present right to do so, there is no intent to do so, or property is exempt by law from repossession;

## PRAYER

WHEREFORE  Plaintiff demands judgment for damages  against defendants Midland, for actual, compensatory and statutory damages, appropriate equitable relief, costs of suit and attorney's fees pursuant to 15 U.S.C. § 1692k, and such other relief as the Court deems just and proper.

plaintiff asks for punitive judgment against Midland pursuant to Conn. Gen. Stat. § 42-110g(a), in the amount of Five million dollars to be paid to the State of Connecticut or any other amount the Court find equitable. This amount to be appropriated to educate, inform its residents about debt collectors companies and their unfair practices, and to deter other debt collectors from abusing more residents, or to enrich themselves at the expense of the people.

An Order granting other further relief as this Court may deem just and proper.

Demand For Jury

Zohair Alnabulsi, Pro See Litigant

Zalnabulsi@yahoo.com  800 Village Walk #132 Guilford, CT 06437 (203) 500 4754.